19 December 2016

To: The Honorable Judge R. Sipple
United States District Court
Southeastern District
555 Independence Street
Cape Girardeau, Missouri
63703

From: Mr. Terrance L. Fields, Sr.
Reg. No. 07522-010
FCC Forrest City Low
P.O. Box 9000-Low
Forrest City, Arkansas
72336

Re: Docket Number 2:05CR00158RNS

Dear Judge Sipple,

Again I am reaching out to you that you might allow mercy to grant relief from my long, unfair and overly exhausted sentence. My name is Terrance L. Fields, Sr. known to you as docket number 2:05CR00158RNS. Again I would like to bring to your honor's attention that during sentencing you stated that you really didn't feel comfortable with the governments recommendation of my sentence. Sir, you also sought for ways to impose a lessor sentence in which didn't pan out for me. Sir, you and I can both agree that today judges can now demonstrate discretion and be opinionated if they are seeking to impose a lessor sentence, in which that judge may feel that fits the offense. Sir, I have been led to believe for almost a year now, that I would be granted, (Immediate Release) based on some decisions of Johnson V. United States, that leads to Travis Beckles and others arguing as unconstitutionally vague the residual clause of the Armed Career Criminal Act. 2015 BL 204915 (U.S. June 26, 2015)... I am aware also that the U.S. Supreme Court is said to settle argument(s) in the month of March or April 2017, in of which is the reason for this letter. Your Honor, those arguments are timely and I am sure that the system will be preserved, but my sentence was overly excessive, even by your own view at the time of sentencing. Sir, I admit to being a felon in possession of a weapon and realize I was in violation to that extent. I even accept that I should serve some time fitting my offense. But why am I still being persecuted and held for offenses that I have already served in which are no longer considered crimes of violence. Also, since my last letter to you, Sir, I now have my ONLY son back in the prison system. I only remember him as that straight "A" student under my parenting. I also now have Three (3) grand daughters along with many nieces and nephews of which I have yet to meet.

My home plan was ordered by the courts recently. Because of my criminal history and other crippling effects of this incarceration, my family support group negotiated a deposit of $650.00 for the first months rent and Five (5) months rent in advance to settle upon and obtain to secure residency, to meet that timely request from the courts for myself to have a stable place to return to. Sir, my history today will show and be proof that through the years since I was sentenced, I have continued to work hard.

Case: 1:05-cr-00158-RWS   Doc. #:  79   Filed: 12/27/16   Page: 2 of 8 PageID #: 376

Page 2                                                               19 December 2016

Re: Docket Number 2:05CR00158RNS

But there is still no sign that I will receive anything for good conduct nor for my achievements. So how is it for a man to be persecuted for his past, but receive no acknowledgement(s) 10 years later for the great or good. Now I ask, does a man like myself give up when he has exhausted all the good he has done, that there is still no sympathy nor empathy? Do I allow myself to develop a negative prospective to co-exist with the life style of those persecutions? I say NO! Instead I continue to better myself through education and character building groups. So that I may transform this negative into a positive, as I hold on to hope that justice will work both ways for me.

Sir, I am sincerely asking that I be granted relief from this nightmare, that I might make the holiday season of 2016. For if I am granted such a relief, my future actions will go on to reflect part of an inspiration to those already great projects and programs that I have read you have implemented since my sentencing, that gave people like myself back their lives and or has given way to a second chance.

I am also seeking, that second chance in which I feel that I have earned and rightfully deserve. I would like to STOP this cycle with myself of incarceration, that began with my father's father, now to be passed on by myself to my son. As I have already stated, that I have served more than 10 years and have managed to maintain a positive outlook on life and life's challenges. I have shown that I have prepared myself for a great future and would serve as an inspirational role model to that effect. I now feel compelled to ask you to reach back and find a way to do for me now, what you were unable to do on January 15, 2007. Despite the finances that was recently put together to obtain a residence for myself, by family member and my support group, their prayers and wishes are in place that I return home during this holiday season that I might be the man that can bring about change to the history of our family. I would like to thank you for your time and attention to this matter.

Happy Holidays to you, your family and staff!

Respectfully,

*Terrance L. Fields, Sr.*


Terrance L. Fields, Sr.
#07522-010
FCC Forrest City Low
P.O. Box 9000-Low
Forrest City, Arkansas
72336

## Supreme Court Term in Review 2015-2016—Criminal Cases – Continued

| Subject | Case Name/ Criminal Law Reporter story and opinion cites | Docket Number/ Decision Date | Holding |
|---|---|---|---|
| | *White v. Wheeler* 98 CrL 242, 12/16/15, 250 | No. 14-1372 12/14/15 | § 2254(d) in state capital cases challenging jury strikes are required to apply a high standard of deference to the trial court's ruling. A federal appellate court therefore erred by granting habeas relief to a defendant challenging a jury strike where the Kentucky Supreme Court found that the trial judge had sound reasons to strike the juror based on his equivocal responses about his willingness to impose the death penalty. |
| Habeas Corpus | *Woods v. Etherton* 99 CrL 11, 4/6/16, 17 | No. 15-723 4/4/16 | The U.S. Court of Appeals for the Sixth Circuit incorrectly denied deference to findings of the state court on whether a defendant received ineffective assistance of counsel under the Sixth Amendment. |
| Habeas Corpus | *Duncan v. Owens* 98 CrL 367, 1/27/16, 402 | No. 14-1516 1/20/16 | The writ of certiorari in a case about whether the U.S. Court of Appeals for the Seventh Circuit violated 28 U.S.C. § 2254 in awarding habeas relief is dismissed as improvidently granted. |
| Habeas Corpus | *Kernan v. Hinojosa* 99 CrL 180, 5/18/16, 199 | No. 15-833 5/16/16 | The California Supreme Court's summary denial of a prisoner's habeas petition is presumed to have been "on the merits," and therefore unreviewable in federal court under the Antiterrorism and Effective Death Penalty Act's deferential-review standards, even though the lower state court opinion denied the claim purely on procedural grounds because those grounds could not possibly have been the reason the state's top court rejected the claim. |
| Habeas Corpus | *Johnson v. Lee* 99 CrL 279, 6/1/16, 287 | No. 15-789 5/31/16 | California's procedural bar on collateral claims that could have been, but were not, raised on direct appeal is an independent and adequate bar to federal habeas corpus review of the claim. The fact that the state courts haven't universally cited the case establishing the rule when denying review doesn't mean that the rule has not been "consistently" applied, which is required for the rule to bar federal review, when no cases have ignored the bar to grant relief. |
| Judges | *Williams v. Pennsylvania* 99 CrL 337, 6/15/16, 351 | No. 15-5040 6/9/16 | Under the due process clause of the Fourteenth Amendment, there is an impermissible risk of actual bias requiring recusal when a judge, earlier, had a significant, personal involvement as a prosecutor in a critical decision regarding a defendant's case. Failure to recuse is structural, not harmless, error, even where the judge did not cast the deciding vote. |
| Juries | *Foster v. Chatman* 99 CrL 213, 5/25/16, 230 | No. 14-8349 5/23/16 | Peremptory juror strikes on the basis of race are impermissible. Compelling evidence indicates that the strikes in this case were motivated in substantial part by discriminatory intent. |
| Jury Instructions | *Musacchio v. United States* 98 CrL 365, 1/27/16, 398 | No. 14-1095 1/25/16 | A defendant's argument that the evidence wasn't sufficient to sustain the jury's guilty verdict is assessed on appeal against the elements of the charged crime, not against the heightened burden of proof set out in an erroneous jury instruction. A defendant can't raise a statute-of-limitations argument for the first time on appeal. |
| Plain Error | *Molina-Martinez v. United States* 99 CrL 101, 4/27/16, 112 | No. 14-8913 4/20/16 | When a defendant is attempting to show that a sentence predicated on the application of an incorrect U.S. Sentencing Guidelines range is plain error, and the sentence he received falls within the correct range, a reviewing court cannot categorically require additional evidence beyond use of the incorrect range for the defendant to satisfy the requirement that the error affected his substantial rights. |
| Post-conviction Remedies | *Welch v. U.S.* 99 CrL 64, 4/20/16, 79 | No. 15-6418 4/18/16 | The rule announced in *Johnson v. United States*, that the so-called residual clause in the Armed Career Criminal Act is unconstitutionally vague, is substantive and has retroactive effect in cases on collateral review. |
| Prisons and Jails | *Simmons v. Himmelreich* 99 CrL 303, 6/8/16, 316 | No. 15-109 6/6/16 | The Federal Tort Claims Act's judgment bar provision doesn't apply to claims dismissed under the act's "Exceptions" section |
| Prisons and Jails | *Ross v. Blake* 99 CrL 302, 6/8/16, 319 | No. 15-339 6/6/16 | The Court of Appeals for the Fourth Circuit's creation of a special circumstances exception to an exhaustion of remedies requirement under the Prison Litigation Reform Act is inconsistent with the text and history of the law. |
| Prisons and Jails | *Bruce v. Samuels* 98 CrL 334, 1/20/16, 344 | No. 14-844 1/12/16 | The discounted filing fee charges that indigent prisoners must pay out of their prisoner accounts under the Prison Litigation Reform Act, 28 U.S.C. § 1915, are applied "per action" and not "per prisoner." |
| Racketeering | *RJR Nabisco Inc. v. European Cmty.* 99 CrL 393, 6/22/16, 418 | No. 15-138 6/20/16 | The Racketeer Influenced and Corrupt Organizations Act incorporates, as predicate crimes, offenses which must involve some foreign conduct, and therefore must reach some conduct that occurs outside the United States. The right of action, however, doesn't clearly indicate an intent that it apply extraterritorially, so a private RICO plaintiff must allege and |

FIELDS, TERRANCE 07522010

states, Virginia is able to keep juveniles up until they turn 21, he explained.

The planned facilities will offer programming for higher risk juveniles who committed more serious crimes and will remain in custody for two years or more. Block said the new youth prisons will provide classrooms for schooling, college classes, and vocational training that will allow older juveniles to get certified as welders, plumbers or other trades.

Overall, the two facilities will reduce the youth prison population from more than 500 beds to about 150—a 70 percent reduction in incarceration, Block said. Those campuses will also be built nearest to the communities that send the most offenders, which will make it easier for family and friends to visit more often, Block said.

"It's unrealistic to think that some kids don't need, at least for some portion of the time, to be confined," he said. "We need to keep them safe and their community safe and you want that number to be as small as possible and you want them to be in a place to get the services and treatment they need to change their life's trajectory, but I'm confident we can do that in the system we're creating."

**Newest Advocates.** One of the biggest challenges in changing the culture of punishment in the eyes of the public and lawmakers is communicating what advocates mean when they say prisons don't work, said Da'Quon Beaver, a community organizer for Legal Aid Justice Center's JustChildren Program.

Beaver spent five years in Virginia's youth prisons, which he said he used to drive his career in advocacy by spearheading an initiative for juvenile offenders by former juvenile offenders called Rise for Youth, an advocacy group under the JustChildren Program that educates lawmakers and the public about why community-based alternatives are better than imprisonment through personal stories.

When a Christmas Day lock down at Beaumont Juvenile Correctional Center prevented him from seeing his family, Beaver said he began to cry. That night served as a turning point for him, he said.

"It woke me up in the sense that I started seeing things differently in how staff talked to us, how we were separated from population, things we had no control over, and in every way [the system] dehumanized us," he said.

Beaver channeled his energy into becoming the president of both youth prisons in which he was incarcerated—similar to a class president—and became an advocate for those dejected kids in the prison. And now, as the leader of Rise for Youth, he leads a team of advocates made up of formerly incarcerated young people between the ages of 14 to 25.

Together, Beaver said they conduct lobby days in Virginia's capital to meet with legislators and share their feedback on what works in the juvenile justice system based on their experiences. They also inform the public in their communities about how and why community-based alternatives are better than incarceration, he said.

Beaver said the group also involves family members and friends in advocating for juvenile justice reform, with the goal being that the state should not make decisions for juvenile offenders without the input of former juvenile offenders.

The reaction from lawmakers and members of the community has been positive, which just excites participants even more, Beaver said.

"I think that it's been shown that these stories of youth who have been in the system—they have powerful voices, and I think those are the people we need to be most vulnerable to," he said.

The program has been a success because everyone needs education on the topic of youth offenders, Beaver said.

"I think people are out of the touch with the fact that we're working with kids," he said. "We're working with kids, with youth, with children. We're working with people whose minds are not fully formed. Understanding that would give a different mindset to a lot of people."

BY JESSICA DASILVA

To contact the reporter on this story: Jessica DaSilva in Washington at jdasilva@bna.com

To contact the editor responsible for this story: C. Reilly Larson at rlarson@bna.com

*Sentencing*

## Justices Renew Scrutiny of 'Crime of Violence' Catchall Definition



A catchall definition of "crime of violence" is once again before the U.S. Supreme Court—this time in the context of the advisory U.S. Sentencing Guidelines (*Beckles v. United States*, U.S., No. 15-8544, argued 11/28/16).

The U.S. Supreme Court's decision in *Johnson v. United States*, 2015 BL 204915 (U.S. June 26, 2015)—in which the court struck down as unconstitutionally vague the residual clause of the Armed Career Criminal Act—left open the question whether nearly identical language in the sentencing guidelines is similarly deficient.

A decision in this case should have an immediate effect—Deputy U.S. Solicitor General Michael R. Dreeben, arguing for the government, told the court that there are thousands of cases in the pipeline waiting for a decision on the retroactivity issue.

Travis Beckles was sentenced as a career offender based on language in Section 4B1.2(a)(2) of the guidelines classifying his offense as a "crime of violence."

During oral argument the parties sparred over three questions: Whether *Johnson* applies retroactively, whether the guideline's residual clause is so vague that its application is a denial of due process, and whether, if the residual clause is void for vagueness, its deficiency fatally taints the commentary to the guideline, which specifically lists the defendant's crime of carrying a sawed-off-shotgun.

**Then and Now.** The Supreme Court has "held that the residual clause has no meaning. And because it has no meaning, the Commission is in no better place to interpret or clarify that language. Where language is meaningless, how can it be clarified?" Janice L. Bergmann, of the Federal Public Defender's Office, Ford Lauderdale, Fla., arguing for the defendant, queried.

Bergmann pointed to the practical effect of the career offender guideline: It "both doubles [Beckles's] sentence and increases it by seven years."

FIELDS, TERRANCE 07S22010

Justice Samuel A. Alito Jr. suggested to Bergmann that a sentencing provision providing for imprisonment for "up to 20 years" seems "a lot vaguer than what we have here." Bergmann replied that the use of a vague guideline "is worse than indeterminate sentencing because it systematically injects arbitrariness into the entire sentencing process."

This prompted Justice Stephen G. Breyer to comment that there was far more arbitrariness before the enactment of the guidelines. Alito pointed out that before the guidelines were enacted, a federal judge could "pick a sentence between zero and years based on that judge's personal ideas about retribution, deterrence, and incapacitation."

Breyer also pointed out that federal judges are not required to apply the guidelines at all. Chief Justice John G. Roberts Jr. added that there seems to be a steady decrease in the imposition of guidelines sentences but that "even the vaguest guideline would be an improvement" over an indeterminate sentence.

Bergmann said the guidelines remain "both the lodestone and the lodestar of federal sentencing."

Justice Anthony M. Kennedy accused Bergmann of making the "sweeping" argument that "the more specific a legislature or an agency tries to make guidance for the judge, the more chance there is for vagueness."

"That's very difficult to accept," Kennedy said.

**Continued Vitality of Guidelines.** Similarly, Dreeben, of the Department of Justice, said that guidelines sentences have not dropped significantly and that since 2011, they account for around 80 percent of federal sentences.

He affirmed that the government's position is that there is no vagueness problem with the guideline in question because it is advisory rather than mandatory.

The government sides with the petitioner with respect to the due process issue, he said. He added that, in view of the commentary specifically addressing a sawed-off shotgun, "the residual clause is not vague as to that particular offense."

**Context is Everything.** Alito said he could pick a random section of the guidelines and find language that would arguably be vague if contained in a statute.
Dreeben told the court, "Due process does not itself require that all provisions of law not be vague in some customary dictionary sense. Due process protects fundamental fairness."

He added that the purposes of the vagueness doctrine "are not implicated in traditional sentencing," which does not produce "uniform or predictable results" but does maximize "individualization or proportionality."

Justice Sonia Sotomayor asked Dreeben whether, if the court rules in the government's favor and declares that *Johnson* is not retroactive, how much of *Johnson* survives. Dreeben made it clear that, in cases involving the ACCA, the government's position is that *Johnson* is retroactive.

Sotomayor said the "essence" of *Johnson* is that the ACCA residual clause asked a sentencing judge to "basically fantasize about what the average case is like," whereas the guideline is applied to specific facts that are reviewable.

**Sentencing Commission Under Duress.** Adam K. Mortara, of Washington, was appointed by the court as amicus curiae in support of the judgment below on the question whether *Johnson* applies to the guideline, thereby rendering challenges to sentences enhanced under it cognizable on collateral review.

He said the career offender guideline does not represent an exercise of the sentencing commission's expertise as much as it is a response to a command of Congress in 28 U.S.C. 994(h). The guideline reflects what the commission was "commanded to do, which is make sure that sentences get at or near the statutory maximum," he said.

For this reason, he said, the presumption of reasonableness normally given to within-guidelines sentences "completely goes away with the career offender guideline." The unusual nature of the guideline is reflected in the statistics on its application, he added, saying only 25 percent of career offenders in 2015 were sentenced within the applicable guidelines range.

Justice Elena Kagan did not participate in the oral argument.

BY ALISA JOHNSON

To contact the reporter on this story: Alisa Johnson in Washington at ajohnson@bna.com

To contact the editor responsible for this story: C. Reilly Larson at rlarson@bna.com

*Argument transcript available at https://www.supremecourt.gov/oral_arguments/argument_transcripts/2016/15-8544_c1o2.pdf.*

*Capital Punishment*

## Death Row Inmate Likely Winner On Mental Disability

It's unconstitutional to execute the mentally disabled. The U.S. Supreme Court at oral argument Nov. 29 wrestled with how states may determine who qualifies as mentally disabled (*Moore v. Texas*, U.S., No. 15-797, *argued* 11/29/16).

The court's liberals hammered Texas Solicitor General Scott A. Keller, arguing for the state, over Texas's application of intellectual disability standards that appeared to incorporate stereotypes.

Justice Anthony M. Kennedy, on whom the court's decision will likely turn, questioned both Keller and Clifford M. Sloan of Skadden, Arps, Slate, Meagher & Flom LLP, Washington, who represented defendant Bobby Moore.

Though Kennedy played his cards close to his chest, he expressed skepticism about Texas's standard, strongly suggesting Moore will ultimately succeed.

The court's conservatives appeared to be fighting a rear-guard action to minimize the sweep of the eventual opinion. They suggested that the question presented didn't match the issues raised in the briefing and appeared to offer only tepid support for Texas's position.

**Disability Disagreement.** Moore was convicted in 1980 of killing a grocery clerk during the course of an attempted robbery. He was sentenced to death.

In 2014 he sought habeas corpus relief on the basis that he was mentally disabled.

Under *Atkins v. Virginia*, 536 U.S. 304 (2002), states may not execute the mentally disabled. Under *Hall v. Florida*, 2014 BL 145335 (U.S. May 27, 2014) states may

FIELDS, TERRANCE 07522010

Here, petitioner Richard Mathis pleaded guilty to being a felon in possession of a firearm. Because of his five prior Iowa burglary convictions, the Government requested an ACCA sentence enhancement. Under the generic offense, burglary requires unlawful entry into a "building or other structure." *Taylor*, 495 U.S., at 598. The Iowa statute, however, reaches "any building, structure, [or] land, water, or air vehicle." Iowa Code § 702.12. Under Iowa law, that list of places does not set out alternative elements, but rather alternative means of fulfilling a single locational element.

The District Court applied the modified categorical approach, found that Mathis had burgled structures, and imposed an enhanced sentence. The Eighth Circuit affirmed. Acknowledging that the Iowa statute swept more broadly than the generic statute, the court determined that, even if "structures" and "vehicles" were not separate elements but alternative means of fulfilling a single element, a sentencing court could still invoke the modified categorical approach. Because the record showed that Mathis had burgled structures, the court held, the District Court's treatment of Mathis's prior convictions as ACCA predicates was proper.

*Held*: Because the elements of Iowa's burglary law are broader than those of generic burglary, Mathis's prior convictions cannot give rise to ACCA's sentence enhancement.

(a) This case is resolved by this Court's precedents, which have repeatedly held, and in no uncertain terms, that a state crime cannot qualify as an ACCA predicate if its elements are broader than those of a listed generic offense. See, *e.g., Taylor*, 495 U.S., at 602. The "underlying brute facts or means" by which the defendant commits his crime, *Richardson v. United States*, 526 U.S. 813, 817, make no difference; even if the defendant's conduct, in fact, fits within the definition of the generic offense, the mismatch of elements saves him from an ACCA sentence. ACCA requires a sentencing judge to look only to "the elements of the [offense], not to the facts of [the] defendant's conduct." *Taylor*, 495 U.S., at 601.

This Court's cases establish three basic reasons for adhering to an elements-only inquiry. First, ACCA's text, which asks only about a defendant's "prior convictions," indicates that Congress meant for the sentencing judge to ask only whether "the defendant had been convicted of crimes falling within certain categories," *id.*, at 600, not what he had done. Second, construing ACCA to allow a sentencing judge to go any further would raise serious Sixth Amendment concerns because only a jury, not a judge, may find facts that increase the maximum penalty. See *Apprendi v. New Jersey*, 530 U.S. 466, 490. And third, an elements-focus avoids unfairness to defendants, who otherwise might be sentenced based on statements of "non-elemental fact[s]" that are prone to error because their proof is unnecessary to a conviction. *Descamps v. United States*, 570 U.S. ___, ___.

Those reasons remain as strong as ever when a statute, like Iowa's burglary statute, lists alternative means of fulfilling one (or more) of a crime's elements. ACCA's term "convictions" still supports an elements-based inquiry. The Sixth Amendment problems associated with a court's exploration of means rather than elements do not abate in the face of a statute like Iowa's: Alternative factual scenarios remain just that, and thus off-limits to sentencing judges. Finally, a statute's listing of disjunctive means does nothing to mitigate the possible unfairness of basing an increased penalty on something not legally necessary to a prior conviction. Accordingly, whether means are listed in a statute or not, ACCA does not care about them; rather, its focus, as always, remains on a crime's elements.

(b) The first task for a court faced with an alternatively phrased statute is thus to determine whether the listed items are elements or means. That threshold inquiry is easy here, where a State Supreme Court ruling answers the question. A state statute on its face could also resolve the issue. And if state law fails to provide clear answers, the record of a prior conviction itself might prove useful to determining whether the listed items are elements of the offense. If such record materials do not speak plainly, a sentencing judge will be unable to satisfy "*Taylor*'s demand for certainty." *Shepard*, 544 U.S., at 21. But between the record and state law, that kind of indeterminacy should prove more the exception than the rule.

786 F. 3d 1068, reversed.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, and SOTOMAYOR, JJ., joined. KENNEDY, J., and THOMAS, J., filed concurring opinions. BREYER, J., filed a dissenting opinion, in which GINSBURG, J., joined. ALITO, J., filed a dissenting opinion.

## Opinion of the Court

JUSTICE KAGAN delivered the opinion of the Court.

The Armed Career Criminal Act (ACCA or Act), 18 U.S.C. § 924(e), imposes a 15-year mandatory minimum sentence on certain federal defendants who have three prior convictions for a "violent felony," including "burglary, arson, or extortion." To determine whether a past conviction is for one of those offenses, courts compare the elements of the crime of conviction with the elements of the "generic" version of the listed offense— *i.e.*, the offense as commonly understood. For more than 25 years, our decisions have held that the prior crime qualifies as an ACCA predicate if, but only if, its elements are the same as, or narrower than, those of the generic offense. The question in this case is whether ACCA makes an exception to that rule when a defendant is convicted under a statute that lists multiple, alternative means of satisfying one (or more) of its elements. We decline to find such an exception.

### I

#### A

[redacted], that "is burglary, arson, or extortion." § 924(e)(2)(B)(ii). In listing those crimes, we have held, Congress referred only to their usual or (in our terminology) generic versions—not to all variants of the offenses. See *Taylor v. United States*, 495 U.S. 575, 598 (1990). That means as to burglary—the offense relevant in this case—that Congress meant a crime "contain[ing] the following elements: an unlawful or unprivileged entry into . . . a building or other structure, with intent to commit a crime." *Ibid.*

To determine whether a prior conviction is for generic burglary (or other listed crime) courts apply what is known as the categorical approach: They focus solely on whether the elements of the crime of conviction sufficiently match the elements of generic burglary, while ignoring the particular facts of the case. See *id.*, at 600– 601. Distinguishing between elements and facts is therefore central to ACCA's operation. "Elements" are the "constituent parts" of a crime's legal definition—the things the "prosecution must prove to sustain a conviction." Black's Law Dictionary 634 (10th ed. 2014). At a trial, they are what the jury must find beyond a reasonable doubt to convict the defendant, see *Richardson v. United States*, 526 U.S. 813, 817 (1999); and at a plea hearing, they are what the defendant necessarily admits when he pleads guilty, see *McCarthy v. United States*, 394 U.S. 459, 466 (1969). Facts, by contrast, are mere real-world things—extraneous to the crime's legal requirements. (We have sometimes called them "brute facts" when distinguishing them from elements. *Richardson*, 526 U.S., at 817.) They are "circumstance[s]" or "event[s]" having no "legal effect [or] consequence": In particular, they need neither be found by a

FIELDS, TERRANCE 07522010



fendant had been convicted of crimes falling within certain categories," and not about what the defendant had actually done. *Taylor*, 495 U.S., at 600. Congress well knows how to instruct sentencing judges to look into the facts of prior crimes: In other statutes, using different language, it has done just that. See *United States v. Hayes*, 555 U.S. 415, 421 (2009) (concluding that the phrase "an offense . . . committed" charged sentencers with considering non-elemental facts); *Nijhawan v. Holder*, 557 U.S. 29, 36 (2009) (construing an immigration statute to "call[ ] for a 'circumstance-specific,' not a 'categorical' interpretation"). But Congress chose another course in ACCA, focusing on only "the elements of the statute of conviction." *Taylor*, 495 U.S., at 601.

Second, a construction of ACCA allowing a sentencing judge to go any further would raise serious Sixth Amendment concerns. This Court has held that only a jury, and not a judge, may find facts that increase a maximum penalty, except for the simple fact of a prior conviction. See *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). That means a judge cannot go beyond identifying the crime of conviction to explore the manner in which the defendant committed that offense. See *Shepard*, 544 U.S., at 25 (plurality opinion); *id.*, at 28 (THOMAS, J., concurring in part and concurring in judgment) (stating that such an approach would amount to "constitutional error"). He is prohibited from conducting such an inquiry himself; and so too he is barred from making a disputed determination about "▓▓▓▓▓" or "what the jury in a prior trial must have accepted as the theory of the crime." See *id.*, at 25 (plurality opinion); *Descamps*, 570 U.S., at ___ (slip op., at 14). He can do no more, consistent with the Sixth Amendment, than determine what crime, with what elements, the defendant was convicted of.

And third, an elements-focus avoids unfairness to defendants. Statements of "non-elemental fact" ▓▓▓ *Id.*, at ___ (slip op., at 15). At trial, and still more at plea hearings, a defendant may have no incentive to contest what does not matter under the law; to the contrary, he "may have good reason not to"—or even be precluded from doing so by the court. *Ibid.* When that is true, a prosecutor's or judge's mistake as to means, reflected in the record, is likely to go uncorrected. See *ibid.*[3] ▓▓▓

Those three reasons stay as strong as ever when a statute, instead of merely laying out a crime's elements, lists alternative means of fulfilling one (or more) of them. ACCA's use of the term "convictions" still supports an elements-based inquiry; indeed, that language directly refutes an approach that would treat as consequential a statute's reference to factual circumstances *not* essential to any conviction. Similarly, the Sixth Amendment problems associated with a court's exploration of means rather than elements do not abate in the face of a statute like Iowa's: ▓▓▓ And finally, a statute's listing of disjunctive means does nothing to mitigate the possible unfairness of basing an increased penalty on something not legally necessary to a prior conviction. Whatever the statute says, or leaves out, about diverse ways of committing a crime makes no difference to the defendant's incentives (or lack thereof) to contest such matters.

▓▓▓ And indeed, our cases involving the modified categorical approach have already made exactly that point. "[T]he only [use of that approach] we have ever allowed," we stated a few Terms ago, is to determine "which *element[s]* played a part in the defendant's conviction." *Descamps*, 570 U.S., at ___, ___ (slip op., at 5, 8) (emphasis added); see *Taylor*, 495 U.S., at 602, ▓▓▓ each element of generic burglary). In other words, the modified approach serves—and serves solely—as a tool to identify the elements of the crime of conviction when a statute's disjunctive phrasing renders one (or more) of them opaque. See *Descamps*, 570 U.S., at ___ (slip op., at 8).[4] It is not to be repurposed as a technique for discovering whether a defendant's prior conviction, even though for a too-broad crime, rested on facts (or otherwise said, involved means) that also could have satisfied the elements of a generic offense.

---

[3] To see the point most clearly, consider an example arising in the immigration context: A defendant charged under a statute that criminalizes "intentionally, knowingly, or recklessly" assaulting another—as exists in many States, see, *e.g.*, Tex. Penal Code Ann. § 22.01(a)(1) (West Cum. Supp. 2015)—has no apparent reason to dispute a prosecutor's statement that he committed the crime intentionally (as opposed to recklessly) if those mental states are interchangeable means of satisfying a single *mens rea* element. But such a statement, if treated as reliable, could make a huge difference in a deportation proceeding years in the future, because an intentional assault (unlike a reckless one) qualifies as a "crime involving moral turpitude," and so requires removal from the country. See *In re Gomez-Perez*, No. A200-958-511, p. 2 (BIA 2014).

[4] *Descamps* made the point at some length, adding that the modified categorical approach "retains the categorical approach's central feature: a focus on the elements, rather than the facts, of a crime. And it preserves the categorical approach's basic method: comparing those elements with the generic offense's. All the modified approach adds is a mechanism for making that comparison when a statute lists multiple, alternative elements, and so effectively creates 'several different . . . crimes.' If at least one, but not all of those crimes matches the generic version, a court needs a way to find out which the defendant was convicted of. That is the job, as we have always understood it, of the modified approach: to identify, from among several alternatives, the crime of conviction so that the court can compare it to the generic offense." 570 U.S., at ___ (slip op., at 8) (citation omitted).

FIELDS, TERRANCE 07522010

Mr. Terrance L. Fields, Sr.
#07522-010
FCC Forrest City Low
P.O. Box 9000-Low
Forrest City, Arkansas
72336



RECEIVED
BY MAIL

DEC 27 2016

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
CAPE GIRARDEAU

**Honorable Judge R. Sipple**
United States District Court
Southeastern District
555 Independence Street
Cape Girardeau, Missouri
63703